

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| DENNIS WAYNE GLENN, | § | No. 08-21-00059-CV |
| Appellant, | § | Appeal from the |
| v. | § | 112th Judicial District Court |
| PATTY ANN GLENN, | § | of Upton County, Texas |
| Appellee. | § | (TC#17-11-U-4576-DIV) |
| | § | |

## **O P I N I O N**

Appellant, Dennis Wayne Glenn, (Glenn) appeals the trial court's division of the marital estate between him and Appellee, Patty Ann Glenn, now Patty Ann Dollar, (Dollar) upon divorce. Glenn argues the court arbitrarily: (1) assigned values to three marital assets; and (2) divided those assets; which resulted in an unjust division wherein the court awarded Dollar significantly more than half of the marital estate. We affirm.

## BACKGROUND

Glenn and Dollar were married in 2006. The couple separated in July 2017, and Dollar filed for divorce in November 2017 on the ground that the marriage had become insupportable. Dollar asked for a disproportionate share of the parties' estate based on fault in the breakup of the marriage and several other factors.

No children were born of the marriage, although Dollar had a son who was severely disabled and bedridden. During the marriage, Dollar cared for her son as a paid, full-time HTS worker until his death in 2013. Glenn worked outside the home. In 2012, during the marriage, Glenn and his son started BNT, L.L.C. (BNT)—a weed control business—where Dollar worked as the BNT bookkeeper for a period of time. Dollar also worked as a seasonal employee of H&R Block for a couple of years after her son's passing.

During the course of their marriage, BNT acquired several vehicles and land lots, and the couple amassed three vehicles, real estate, burial lots, retirement accounts, and various possessions. Those assets included the two houses at issue on appeal; namely, a house in McCamey, Texas (the McCamey house) and a house by Red Bluff Lake (the Lakehouse).

Upon separation, temporary orders required Glenn to pay the credit card bills, retain Dollar on his health insurance, deposit sufficient funds into their joint bank account for her reasonable living expenses and medical care. Further he was to maintain utility services at the marital residence and not keep Dollar from use and enjoyment of it, not spend funds from their joint bank account other than for his reasonable living expenses and medical care, and engage only in reasonable and necessary acts to conduct their business and occupation. Glenn was ordered not to remove value from their property or make withdrawals from accounts except for the purposes authorized by the order. Dollar moved to Dibble, Oklahoma, where she lived with and cared for her mother. Dollar did not work outside the home before 2020, even though she applied to a few jobs unsuccessfully. Dollar was employed for three months in early 2020 for $17 an hour before she was let go due to COVID. She applied for other jobs after that unsuccessfully. As of the final hearing, Dollar had no income.

Dollar struggled with health problems. Dollar was undergoing medical testing until the health insurance coverage associated with Glenn's job dropped her in 2018 and she had no other coverage. Even though the court order required him to maintain Dollar's health insurance, Glenn did not add her to the health insurance from his new employment in 2018 because he did not think the divorce would continue on so long. As a result, Dollar could not continue to pursue her medical care. Dollar was sued for medical debt she incurred and could not pay, as Glenn also stopped placing sufficient funds into their account for the credit card payments in violation of the temporary orders. In 2019, Dollar consolidated the credit card debt to arrange for lower monthly payments and the remaining debt as of the final hearing was $36,191. Eventually, Dollar was sued for $15,248 in medical expenses and $3,625 of medical bills in collections. In violation of the temporary orders, Glenn did not deposit sufficient funds into their joint account to fund Dollar's reasonable living needs. Even though Dollar lived modestly and did not spend money excessively or in violation of the court order, she borrowed money from her family to get by.

Through the discovery process, Dollar requested all financial documents, profit and loss statements, income-reporting documents, and the like, pertaining to Glenn and any entity in which the parties owned any interests, which he controlled. Glenn failed to produce responsive documents pertaining to BNT, his 2018 and 2019 income tax statements, and other financial records during the pendency of the divorce. Although he did produce an illegible page of numbers, he purported were Dollar's expenses he paid since 2017, they came without any supporting bank records. As of the final hearing, Glenn had produced only his 2017 income tax statement. He produced a 2018 tax return which was discovered to belong to his son of the same name. Glenn attributed the discrepancy to his accountant's error. Glenn's actual 2018 tax return was not

produced. Glenn never produced his 2019 tax return and failed to disclose he filed extensions for his 2018 and 2019 tax returns. At the final hearing, Glenn first testified he had turned over to his attorney everything he was required to in response to Dollar's discovery requests. Glenn then testified he did not produce what he was required to produce pursuant to Dollar's discovery requests. Dollar pursued sanctions for Glenn's repeated failure to respond to her discovery requests.

At the final hearing, several points came to light. Glenn worked for Brazos in 2018 and then for Howard Energy since 2019, where his base salary was $180,000. Dollar testified Glenn withdrew many large cash sums from their joint account as well as from the BNT account without supporting documentation. Dollar testified to Glenn's cash withdrawals of $21,769, $34,040, and $43,594 from a BNT account and two golf expenses of $12,935 and $5,743; related hotel expenses of $2,141; expenditures of $34,800 for the Lakehouse; and other items that appeared to be of a personal nature in individual amounts of under $2,000 each, spent from the BNT account all without the court's permission. Dollar entered into the record BNT's principal account bank records in support of her testimony. Glenn did not deny any of these expenditures other than to say that the golf-related expenditures and trips were business expenses.

When asked the amount of money BNT had in its principal account, he responded, "I have no idea." Glenn's son testified the account had $406,000 in the bank, that 50% was his father's, that Glenn had access to that account, and Glenn has withdrawn from the account. Glenn's son also testified he and his father would split the BNT assets 50/50 if the company were to dissolve. At the final hearing, Glenn entered an exhibit reflecting BNT's inventory was community property,

4

which included vacant lots, four trucks[1], and a tractor, amounting to a value of $101,732, but encumbered in the amount of $28,000 and BNT owing $1,143.78, $124.53, and $905.80 in taxes on these items. Only Glenn and his son/business partner testified for Glenn. BNT's Limited Liability Company Authorization Resolution gave Glenn the right to exercise all powers of the company with his signature alone and the Texas Franchise Tax Public Information Report reflected Glenn was the BNT President and Director. Dollar testified from their joint bank account: Glenn withdrew $21,720 in 2018; withdrew another $20,949 in 2019, and kept $45,000 of a $45,419.50 deposit in 2018.[2] Glenn spent joint account funds on golf expenses and spent over $1,000 at a lips and aesthetics salon. Glenn also testified he had $6,000 sitting in another previously undisclosed separate personal checking account. Glenn acknowledged the spending prohibitions in the temporary orders. At one point, at the end of the hearing, in response to a question about why he did not pay taxes on income he accumulated since 2017 given all of his cash withdrawals, he testified generally "those cash withdrawals are inaccurate, and I didn't pay it because during mediation, I was advised that I need her to sign the tax return. I haven't had any contact with her in three years or more." Dollar requested cash reimbursements as part of the property division.

The trial court's award to Glenn included the McCamey house and its contents, the Lakehouse and its contents, land, a boat, a golf cart, and the remaining BNT assets (accounts, real property, and personal property) after awarding Dollar $165,000 as her share of the community interest in BNT taking into account the BNT inventory ($100,000 currently in the bank within 20

---

[1] One additional asset—the 2017 .75-ton Chevrolet Silverado Crew Cab—is listed but not valued in Glenn's inventory exhibit or anywhere else in the record; Glenn entered a promissory note for it in the amount of $35,916.01 dated April 2019. We leave the asset and its encumbrance out of the inventory.

[2] Glenn testified the $45,000 was sitting in another previously undisclosed BNT bank account.

5

days and the remaining $65,000 in payments). The award to Dollar also included three burial plots; a truck; and sums of $45,000 (currently in the bank within 20 days), $30,000 (in payments), and $6,000 (currently in the bank within 20 days), which the court stated represented equity in the McCamey house and the Lakehouse. The court also divided up Glenn's retirement accounts in equal shares to the parties with the exception of one 401K account, 65% of which was awarded to Dollar and 35% to Glenn. Finally, the court awarded Dollar $21,230—Glenn's share of consolidated credit card debt, $8,951 in attorney fees and court costs for the divorce proceedings, and $3,468 for her medical expenses.

The court assigned Dollar half of the consolidated credit card debt, half of the debt owed on all litigation filed against her for nonpayment of credit card debt incurred during the marriage, and the full amount of her remaining medical services debts and student loan debt. The court assigned Glenn the balance due on the houses, the remaining payments on Dollar's truck, the remaining credit card debt, half the debt owed on all litigation filed against her for nonpayment of credit card debt incurred during the marriage, and any other debt on the real and personal property awarded to Glenn.[3] Glenn moved for a new trial, attaching a declaration stating the court failed to hear certain information regarding Glenn's payment of Dollar's debts and refinancing old debts in addition to the court awarding his separate property including money on deposit with [BNT], "which is a company that I do not own and do not have the right to withdraw the month awarded to [Dollar]," claiming he could not make payments scheduled by the court and arguing the evidence

---

[3] The court acknowledged that the parties owe taxes from previous years and Glenn filed for tax extensions in 2018 and 2019, but those taxes were purposefully not included in the court's award. Instead, the court left it to the parties to address the matter directly with the IRS if a dispute arises in the future over tax liability.

did not establish BNT was community property and evidence supporting the award was legally and factually insufficient. His motion was denied, and this appeal ensued.[4]

## ISSUES

In two issues, Glenn contends that the trial court abused its discretion by (1) dividing the real property interest on the McCamey house and the Lakehouse without competent evidence before it and (2) improperly valuing their business BNT, L.L.C., resulting in an unjust distribution of property.

## STANDARD OF REVIEW AND APPLICABLE LAW

We review an appeal of property division in a divorce case on an abuse of discretion standard. *Battle v. Battle*, 642 S.W.3d 140, 145 (Tex.App.—El Paso 2021, no pet.); *Kaftousian v. Rezaeipanah*, 511 S.W.3d 618, 621 (Tex.App.—El Paso 2015, no pet.). Because Glenn challenges the evidence pertaining to real property and business valuation, we ask both (1) whether the trial court had sufficient information upon which to exercise its discretion and (2) whether the division of the estate was so manifestly unjust and unfair as to constitute an abuse of its discretion. *Chafino v. Chafino*, 228 S.W.3d 467, 472-73 (Tex.App.—El Paso 2007, no pet.); *Burney v. Burney*, 225 S.W.3d 208, 215 (Tex.App.—El Paso 2006, no pet.); *Chacon v. Chacon,* 222 S.W.3d 909, 915 (Tex.App.—El Paso 2007, no pet.).

*Legal and Factual Sufficiency*

---

[4] Glenn complained he no longer has the $180,000 job with Howard Energy, that he is living off a four-month severance, and he is interviewing for new jobs now. We are not addressing this issue, as "the value of community assets is generally determined as of the date of divorce or as close to that date as possible." *Quijano v. Quijano*, 347 S.W.3d 345, 349 (Tex.App.—Houston [14th Dist.] 2011, no pet.).

The test for legal sufficiency is whether reasonable people could reach the decision under review given the evidence in the record—viewing all evidence and inferences in a favorable light to the trial court's decision (if a reasonable fact finder could) and disregarding all contrary evidence (unless a reasonable fact finder could not). *See City of Keller v. Wilson*, 168 S.W.3d 802, 827-28 (Tex. 2005). Appellate courts "will sustain a legal sufficiency or 'no-evidence' challenge if the record shows: (1) the complete absence of a vital fact, (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a scintilla, or (4) the evidence establishes conclusively the opposite of the vital fact." *Wheeling v. Wheeling*, 546 S.W.3d 216, 223 (Tex.App.—El Paso 2017, no pet.)(citing *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005)).

Factual insufficiency is when the trial court's finding is "so against the great weight and preponderance of the evidence as to be clearly wrong." *Wheeling*, 546 S.W.3d at 223; *see Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001)(per curiam); *Tate v. Tate*, 55 S.W.3d 1, 5 (Tex.App.—El Paso 2000, no pet.). As the court relies on the parties to produce the evidence upon which to make its decision, usually "[t]he 'insufficient evidence' point of error is appropriate only when the party without the burden of proof on an issue complains of the court's findings." *Wheeling*, 546 S.W.3d at 224; *see also Kimsey v. Kimsey*, 965 S.W.2d 690, 700 (Tex.App.—El Paso 1998, pet. denied).

The trial court is tasked with determining witnesses's credibility and the weight their testimony carries. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). The trial court, as the fact finder, determines who to believe, how to resolve inconsistencies in witness testimony, and what testimony to credit. *Gomez v. Gomez*, 632 S.W.3d 4, 9-10 (Tex.App.—El

Paso 2020, no pet.); *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986). "The trial court in a divorce case has the opportunity to observe the parties on the witness stand, determine their credibility, evaluate their needs and potentials, both social and economic." *Murff v. Murff*, 615 S.W.2d 696, 700 (Tex. 1981). The appellate court is not to override the trial court's credibility determinations or which testimony it chose to believe, as the trial court heard, watched, and assessed witness testimony.

*Abuse of Discretion; Just Division of the Marital Estate*

It is not enough for an Appellant to prove the trial court erred in valuing marital assets; errors do not require reversal unless an Appellant also proves that the court's division of property is manifestly unjust and unfair as a result. *See Wheeling*, 546 S.W.3d at 224 (citing TEX.R.APP.P. 44.1(a)(1)); *Burney,* 225 S.W.3d at 215. A reviewing court is to presume the trial court properly exercised its discretion and will only disturb the trial court's decision if the appellant proves, based on evidence in the record, that the court clearly abused its discretion, i.e., that it failed to act with regard for any guiding rules and principles. *Battle*, 642 S.W.3d at 145; *Martinez Jardon v. Pfister*, 593 S.W.3d 810, 819-20 (Tex.App.—El Paso 2019, no pet.); *Kaftousian*, 511 S.W.3d at 621.

Because no findings of fact or conclusions of law were filed in this case, we presume the trial court made findings necessary to support the judgment,[5] which must be upheld on any legal

---

[5] *Battle*, 642 S.W.3d at 146; *Chafino*, 228 S.W.3d at 472; *Richardson v. Richardson*, 424 S.W.3d 691, 697 (Tex.App—El Paso 2014, no pet.). "These necessary findings will be implied provided that: '(1) the proposition is one raised by the pleadings and supported by the evidence; and (2) the trial judge's decision can be sustained on any reasonable theory that is consistent with the evidence and the applicable law, considering only the evidence favorable to the decision.'" *Sprick v. Sprick*, 25 S.W.3d 7, 11 (Tex.App.—El Paso 1999, pet. denied)(quoting *Brodhead v. Dodgin,* 824 S.W.2d 616, 620 (Tex.App.—Austin 1991, writ denied), *quoting Franklin v. Donoho,* 774 S.W.2d 308, 311 (Tex.App.—Austin 1989, no writ)).

theory the record supports.[6] Here, we look to a variety of factors upon which the trial court could have legally based a greater award of the marital property to Dollar. *See Chafino*, 228 S.W.3d at 472–73. These factors include the spouses' (1) relative earning capacity; (2) relative business opportunities; (3) relative health and physical conditions; (4) relative financial conditions; (5) relative ages; and (6) education; as well as (7) the size of their separate estates; (8) the nature of the property; and (9) benefits the party not at fault would have derived from continuation of the marriage; and (10) the probable need for future support. *Murff,* 615 S.W.2d at 699; *Battle*, 642 S.W.3d at 145–46; *Barton v. Barton*, 584 S.W.3d 147, 157 (Tex.App.—El Paso 2018, no pet.).

## DISCUSSION

### *Real Estate Valuation*

The trial court had sufficient evidence upon which to determine the value of the two houses at issue on appeal. The evidence in the record from the county's central appraisal district showed the McCamey house was valued at $91,560 and the outstanding mortgage was $50,000. The evidence in the record from the county's central appraisal district showed the Lakehouse was valued at $28,270 and no evidence was presented of any encumbrance thereon. Dollar also testified Glenn spent $34,800 on the Lakehouse from BNT funds—something Glenn did not refute. The court awarded both houses to Glenn and awarded $45,000, $30,000, and $6,000 to Dollar attributable to her share of the equity in the houses. Glenn is correct that based on the evidence, the court's award of a total of $81,000 in connection with the two houses gave Dollar more money

---

[6] *In re Pirelli Tire, L.L.C.*, 247 S.W.3d 670, 686 (Tex. 2007)(orig. proceeding)(citing *Davis v. Huey*, 571 S.W.2d 859, 862 (Tex. 1978); *Seaman v. Seaman*, 425 S.W.2d 339, 341 (Tex. 1968)); *Point Lookout W., Inc. v. Whorton*, 742 S.W.2d 277, 278 (Tex. 1987)(per curiam); *Allen v. Allen*, 717 S.W.2d 311, 313 (Tex. 1986).

than the $69,830 equity in both houses not taking into account the additional expenditures on the Lakehouse.

But the analysis does not stop here. Even if the trial court erred in attributing the three amounts to Dollar's equity in the houses, we look to the whole estate to determine whether it divided the marital estates in a just manner. A just distribution does not necessarily mean an equal distribution. *Murff*, 615 S.W.2d at 698. The trial courts have broad latitude to determine what constitutes a just division of the marital estate "having due regard for the rights of each party[.]" TEX.FAM.CODE ANN. § 7.001; *see also Murff*, 615 S.W.2d at 698. This Court's role is to rather determine whether the trial court had a rational basis for its decision to divide the estate as it did based on information in the record.[7] There is no reversable error if the trial court reached the correct result for the wrong reason.[8] Here, while the trial court may have mistakenly attributed the awards of $45,000, $30,000, and $6,000 to Dollar's share of the equity in the houses collectively, we conclude that the $81,000 awarded for the couple's non-business portion of the estate was not manifestly unjust.

In this case, Dollar asked for cash reimbursements as part of the property division in light of the amounts Glenn withdrew from the couple's joint account, his depletion of marital property, and the additional $6,000 in a separate undisclosed checking account, all in violation of the court's orders. Those amounts, based on evidence Dollar presented, were in excess of $90,000. It is well settled that a trial court may award a money judgment to one spouse against the other to achieve

---

[7] *Landon v. Jean-Paul Budinger, Inc.*, 724 S.W.2d 931, 938 (Tex.App.—Austin 1987, no writ).

[8] *Bruce Terminix Co. v. Carroll*, 953 S.W.2d 537, 540 (Tex.App.—Waco 1997, orig. proceeding)(quoting *Luxenberg v. Marshall*, 835 S.W.2d 136, 142 (Tex.App.—Dallas 1992, orig. proceeding)), *mand. granted In re Bruce Terminix Co.*, 988 S.W.2d 702 (Tex. 1998)(per curiam).

an equitable division of the community estate upon reviewing all of the facts and circumstances. *See Murff,* 615 S.W.2d at 699; *Blair v. Blair*, 642 S.W.3d 150, 161 (Tex.App.—El Paso 2021, no pet.). Here, it would appear that the $81,000 was an attempt to equally split the equity in the homes, the additional amounts attributable to Glenn's spending from their joint account in violation of the court orders, and the $6,000 in an undisclosed personal account.

However, even if the trial court's $81,000 award mistakenly attributable to the equity in the McCamey house and the Lakehouse constituted significantly more than half of the non-BNT portion of the marital estate, several of the *Murff* factors provide legitimate grounds upon which the trial court could have justly based that greater award to Dollar. *See Chafino*, 228 S.W.3d at 472–73. Most relevant here are the parties' relative earning capacities, their relative business opportunities, their relative health and physical conditions, their relative financial conditions; and Dollar's probable need for future support. *See Murff,* 615 S.W.2d at 699; *Battle*, 642 S.W.3d at 145–46; *Barton v. Barton*, 584 S.W.3d 147, 157 (Tex.App.—El Paso 2018, no pet.).

At the time of the final hearing, Dollar did not have any income whereas Glenn had a job with a base pay of $180,000. During the pendency of the divorce, Dollar had applied for many jobs and was only able to secure one job for a few months before being released due to COVID. In the meantime, Glenn went from one job to the next then the next. Both Dollar and Glenn testified that Dollar struggled with health issues, that she constantly had the need to seek medical care and testing, and she spent tens of thousands of dollars on medical care. There is nothing in the record indicating that Glenn had any adverse health conditions.

The record shows Glenn and Dollar had very different business opportunities, as he retained his involvement with BNT while Dollar no longer had access thereto following the

12

separation. Although he was not involved in the day-to-day BNT operations, the business benefitted the marital estate. BNT funded many of Glenn's activities, trips, and provided a source of cash during the pendency of the divorce, allowing him to maintain a style of living very different from Dollar, who was relying on her family for financial help.

Looking at the $81,000 award in light of the evidence supporting the court's division of the equity in the houses and the reimbursement to Dollar of her share of what Glenn depleted and hid from her, we find legally and factually sufficient evidence supports the trial court's just award to Dollar in the amount of $81,000 for the non-BNT portion of the marital estate, even if the trial court mistakenly attributed that amount solely to the equity in the houses.

*Business Interest Valuation*

Glenn argues the trial court improperly valued BNT resulting in an unjust distribution of property. Glenn was the only party who had access to the BNT business records, many of which he failed to produce. At the final hearing, Glenn's son confirmed that Glenn had full access to BNT's bank account and holdings, the focal BNT cash account had $406,000 in it, and that Glenn would receive 50% of all BNT assets upon dissolution.[9] The record includes Glenn's list of additional BNT assets with a net worth of approximately $73,732. While Glenn produced records of under $2,500 owed in taxes on the items in his inventory list

Glenn's son testified that BNT was worth about $150,000 and that they still had to pay about $60,000 in taxes from the $406,000; Glenn produced no records or documentation to support

---

[9] Glenn never produced evidence of separate property, other than his son testifying that half of BNT was not Glenn's, and one item on his inventory list under BNT's name but noted as his son's separate property (not taken into account in this opinion). Here, BNT was started during the marriage, and property on hand is presumed to be community property, something Glenn would have had to refute through clear and convincing evidence. *See Blair v. Blair*, 642 S.W.3d 150, 155–56 (Tex.App.—El Paso 2021, no pet.); TEX.FAM.CODE ANN. § 3.003(a) and (b).

13

this assessment. Dollar, on the other hand, testified and produced supporting bank records showing that Glenn withdrew $99,403 from the primary BNT account, spent $34,800 on the Lakehouse from the BNT account (the Lakehouse the trial court awarded to him), and had another $46,357 in another previously undisclosed account. Glenn neither disputed these amounts nor proffered evidence to controvert them.

The trial court relies on the parties for evidence on which to base its decision. *Chafino*, 228 S.W.3d at 472–73; *Burney,* 225 S.W.3d at 215. "Generally, a party who does not provide to the trial court any value for the property cannot, on appeal, complain of the trial court's lack of information in dividing the community estate. *Todd v. Todd*, 173 S.W.3d 126, 129 (Tex.App.—Fort Worth 2005, pet. denied); *Deltuva v. Deltuva*, 113 S.W.3d 882, 887 (Tex.App.—Dallas 2003, no pet.)(op. on reh'g); *Sereno v. Sereno*, No. 13–08–00691–CV, 2010 WL 5541709, at *2 (Tex.App.—Corpus Christ Dec. 30, 2010, no pet.)(mem. op.); *Vannerson v. Vannerson*, 857 S.W.2d 659, 670 (Tex.App.—Houston [1st Dist.] 1993, writ denied); *see also LeBlanc v. LeBlanc*, 761 S.W.2d 450, 453 (Tex.App.—Corpus Christi 1988), *aff'd*, 778 S.W.2d 865 (Tex. 1989)(holding that "where an appellant fails to provide values on any of the property to the trial court, he cannot on appeal complain of the trial court's lack of complete information in dividing [or valuing] that property")." *Wheeling*, 546 S.W.3d at 228. Not only did Glenn fail to produce credible evidence of BNT's value, but "[m]athematical precision in dividing property in a divorce is usually not possible. Wide latitude and discretion rests in these trial courts and that discretion should only be disturbed in the case of clear abuse." *Murff*, 615 S.W.2d at 700.

Looking at the trial court's award of $165,000 to Dollar as her interest in BNT, understanding that the marital interest in the company was 50% and considering the *Murff* factors

discussed above, we find that the trial court did not abuse its discretion even if the award was greater than half of the BNT assets. Whether the trial court believed that BNT still owed somewhere in the vicinity of $60,000 in unspecified taxes, it could have reasonably taken into account the legally and factually sufficient evidence that: the primary BNT account had $406,000 at the time of the final hearing; during the pendency of the divorce, Glenn withdrew cash totaling $99,403 from the primary BNT account; Glenn spent $34,800 on the Lakehouse from the BNT account (the Lakehouse that the trial court awarded to him and whose value did not take into account these expenditures); and BNT had vacant lots, trucks, and a tractor with a net value of $73,732 with less than $2,500 in taxes owed, according to Glenn's inventory accounting.

For the foregoing reasons, we overrule Glenn's second issue.

## CONCLUSION

Glenn did not show that the trial court abused its discretion in dividing the marital estate. We affirm the trial court judgment.


August 24, 2022

YVONNE T. RODRIGUEZ, Chief Justice

Before Rodriguez, C.J., Palafox, and Alley, JJ.

15